UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| EDWARD DECLERCQ, | Civil Action No. 10-4999 (SDW)(MCA) |
| Plaintiff, | |
| v. | **OPINION** |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | August 10, 2011 |

**WIGENTON**, District Judge.

Before the Court is Plaintiff Edward Declercq's ("Plaintiff" or "Declercq") appeal of the final administrative decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") that he is not disabled under 42 U.S.C. § 1614(a)(3)(A) of the Social Security Act (the "Act"). This appeal is decided without oral argument pursuant to Local Civil Rule 9.1(b). The Court has subject matter jurisdiction pursuant to 42 U.S.C. § 405(g). Venue is proper under 28 U.S.C. § 1391(b). For the reasons set forth below, this Court affirms the Commissioner's decision.

**FACTUAL BACKGROUND**

**A.   Personal and Employment History**

Declercq is thirty-six years old. (Ex. 1A at 1; Pl.'s Br. 3.) After finishing high school, Declercq completed two-years of college at the School of Continuing and Professional Studies at New York University. (Tr. 8; Req. for Review of Hr'g Decision/Order 2.) He also finished a course at Passaic County Community College. (Tr. 8.)

From 1996 to 2001, Declercq worked at Yofi Textile. (Ex. 4E at 1, 8.) Between 2001 and 2002, Declercq worked at Temco, a cleaning service company, and at Airborne Express, a mail carrier. (Ex. 4E at 1.) From 2002 to 2003, Declercq worked in a wine warehouse for American B-D. (Tr. 3.) Declercq's most recent employment was with the Argentina Soccer Club restaurant where he worked part-time as a cashier, kitchen cleaner, cook and waiter from May 2004 to June 2005. (Id.; Ex. 4E at 1, 6.)

**C.     Medical History**

On July 3, 2003, Plaintiff was involved in a motor vehicle accident. (ALJ Decision at 4; Tr. 4-5.) Plaintiff maintains that he suffers from neck and back pain because of the accident. (ALJ Decision at 6.) On July 30, 2003, Declercq was injured while lifting cases of wine for American B-D. (Id. at 5.) Declercq filed a worker's compensation claim, which later settled in 2008. (Id.)

On August 12, 2003, results from an MRI revealed a disc bulge at L-5, a disc bulge at C4/C5, and straightening of the normal lordosis, suggesting a muscle spasm. (Ex. 1F at 2.) The MRI, however, did not reveal any stenosis, disc herniations or an abnormal spinal cord. (Id.) On August 21, 2003, Declercq underwent another MRI of his lumbar spine, which revealed a "[m]inimal right foraminal disc bulge at L4-5." (Ex. 1F at 11.)

Dr. Peter Schmaus ("Dr. Schmaus") examined Plaintiff on September 12, 2003, and diagnosed Plaintiff with a myoligamentous injury of the cervical and lumbar spine. (Ex. 17F at 2.) However, Dr. Schmaus noted that Declercq had a functional cervical range of motion, normal gait, "no atrophy or fasciculation of the lower extremities," and no signs of stenosis or herniated disks. (Id.; Ex. 19F. at 2.)

On November 17, 2003, Dr. Todd Koppel ("Dr. Koppel") examined Declercq and concluded that he had a C4-5 cervical disk bulge, cervical thoracic myofascial pain, L4-5 lumbar disk bulge, possible cervical radiculopathy, possible right lumbar radiculopathy, and possible facet arthropathy. (Ex. 20F at 2.) Plaintiff visited Dr. Koppel about four times thereafter. (See id. at 4-6.) In his final examination of Declercq on August 10, 2004, Dr. Koppel observed that Plaintiff had a C4-5 cervical disk derangement, sacroiliac versus facet joint pain and possible cervical radiculopathy. (Id. at 7.)

However, on April 15, 2004, Plaintiff was examined by an orthopedist, Dr. Armando Martinez ("Dr. Martinez"), who articulated that Plaintiff did not require any further medical treatment and that he was "capable of working in a less strenuous type of activity." (Ex. 22F at 3.) Dr. Martinez further concluded that Plaintiff had a normal gait, no muscle spasms, and no atrophy of the lower extremities. (Id.) Declercq revisited Dr. Martinez approximately a year later on April 14, 2005, and Dr. Martinez stated that there was no "objective evidence of radiculopathy" and that his "condition [was] consistent with soft tissue injuries to the lumbosacral spine." (Id. at 5.) As such, Dr. Martinez, once more, concluded that Plaintiff was physically capable of working. (Id.)

Between July 18, 2003 and August 3, 2004, Plaintiff was treated at the Paterson Chiropractic Center (Ex. 2F at 1, 13.) The diagnosis on his last recorded visit at the center included a disc bulge at C4-5 and L4-5, "weakness and instability of cervical and lumbar spine," and restrictions of his cervical and lumbar spine areas due to continuing muscle spasm. (Id. at 12-13.)

Plaintiff was evaluated by Dr. Henry Birnbaum ("Birnbaum") on April 5, 2005. (Ex. 5F at 10.) Dr. Birnbaum noted that Declercq had a chronic lumbar strain, minor cervical and lumbar

disc bulges, and that Declercq had intermittent complaints of paresethsia. (Id.) An MRI taken on April 11, 2005 showed an annular tear with a left central disc extrusion, which "compresse[d] on the thecal sac and mildly narrow[ed] the left neural foramina" at the T11-12 interspace. (Id.) The results also suggested "a right foraminal disc protrusion with resultant stenosis and contact but no[] impingement of the exiting nerve root" at L4-5, and a minor diffuse disc bulge at L5/S1. (Id.) On July 26, 2005, Dr. Birnbaum advised that Declercq had a lumbar disc displacement, but that his condition was non-surgical and with "[n]o red flags." (Id. at 6.) Plaintiff also underwent physical therapy beginning on April 13, 2005, with Michael Cormican ("Cormican"). (Ex. 5F at 57.) Cormican opined that Declercq suffered from "postural related cervical/lumbar radiculopathies." (Id.)

On March 1, 2006, Dr. Arthur Tiger ("Dr. Tiger"), an orthopedist, evaluated Declercq's lumbar and cervical spine. (Ex. 24F at 2.) Dr. Tiger concluded that Declercq had a full range of motion of his cervical spine, but had pain on extreme motions. (Id.) It was Dr. Tiger's impression that Declercq had the "residuals of a chronic cervical strain syndrome with chronic myofascitis and a 4-5 bulging disc for which [he] would estimate a disability of 30% of partial total" and the "residuals of a chronic lumboscaral strain syndrome with chronic myofascitis, a protruding 4-5 disc with a left-sided L5 radiculopathy for which [he] would estimate a disability of 35% of partial total." (Id.)

Contrary to Dr. Tiger's determinations, on November 14, 2006, Dr. Sidney Bender ("Dr. Bender") concluded that Declercq's gait was normal and that his deep tendon reflexes were active and symmetrical. (Ex. 26F at 1, 4.) Furthermore, he reported that Declercq was "able to bend until his fingertips reach[ed] the lower calf level," and was able to execute an eighty-five degree straight leg raise. (Id. at 5.) Dr. Bender found that Declercq had "no muscle atrophy or

focal weakness at any point in the upper or lower extremities," and no signs of lumbar radiculopathy. (Id. at 4-5.) In his neurological examination of Declercq, Dr. Bender commented that Declercq was "suffering from a major depression," but that there was "no objective evidence of permanent neurologic or neuropsychiatric disability." (Id. at 5.)

A June 11, 2007, Residual Functional Capacity ("RFC") report noted that Declercq had chronic cervical and lumbar radiculopathy with myofascitis. (Ex. 8F at 1.) The RFC report indicated that Declercq can "be expected to tolerate" walking, standing, or sitting for only "less than one hour" in an eight-hour day, and that he can "occasionally" lift a five to ten pound weight. (Id.) The report also noted that Plaintiff was restricted in climbing stairs or ladders and bending, and limited in "fine/gross manipulation," (id.), and rated Declercq as having a "[m]oderately severe impairment: an impairment, which seriously affects [the] ability to function." (Id. at 2.) Nonetheless, the report concluded that Plaintiff could perform "[s]edentary work – [w]ork done primarily seated with only occasional standing or walking required, lifting a maximum of 10 pounds, and lifting such articles as dockets, ledgers, and small tools." (Id. at 4.)

On August 31, 2007, an examination by orthopedist, Dr. Alan Friedman ("Dr. Friedman"), suggested some facet anthropathy, which could possibly explain the cause of Declercq's back pain, but there was "no evidence of an active radiculopathy." (Ex. 12F at 2.) Declercq exhibited a "full range of motion in the cervical and lumbar spines as well as in the upper and lower extremities bilaterally," and Dr. Friedman noted that the "[p]hysical exam reveal[ed] a gentleman in no acute distress." (Id.)

Another MRI taken on June 26, 2009, showed "[n]o evidence of disc bulge, spinal stenosis or neural foraminal stenosis." (Ex. 30F at 1.) The MRI also revealed "a very mild

paracentral disc bulge along the right L4-L5 disc space," and a "very mild right-sided neural foraminal stenosis." (Id.)

In addition to cervical and lumbar disorder, Plaintiff suffers from depression. On November 11, 2004, Declercq was diagnosed with dysthymic disorder and received a Global Assessment of Functioning ("GAF") score of 54. (Ex. 29F at 6.) Subsequent examinations between January 26, 2006 and August 9, 2006, suggested that Declercq had a moderate form of major depressive disorder. (Id. at 19-27.)

On October 24, 2006, Dr. Kai-Ping Wang ("Dr. Wang") diagnosed Declercq with major depressive disorder and a GAF score of 35-45 at his initial psychiatric evaluation. (Ex. 9F at 39.) Dr. Wang observed that Declercq "[d]enied suicidality/homicidality," had "[n]o perceptual disturbances," but had "[p]oor impulse control, poor insight, poor reliability, and poor judgment." (Id.) Although Plaintiff's responses to treatment were inconsistent, Dr. Wang noted gradual improvements in Plaintiff's condition. For instance, on February 26, 2007, Declercq reported that he was "going out a bit more" and "visiting friends." (Id. at 22-23.) Moreover, Dr. Wang's mental status notes indicate his level of impairment steadily improved from the period of November 16, 2006 through July 24, 2007. (Id. at 4-35.) To elaborate, Dr. Wang indicated on November 16, 2006, that Plaintiff had moderate levels of depression, anxiety, irritability, distractibility and a slight to moderate impairment in decision making. (Id. at 35.) In comparison, a July 24, 2007 report suggests that Plaintiff had slight depression or anxiety, but otherwise had no other signs of mental impairment. (Id. at 2.)

On August 21, 2007, Plaintiff underwent another psychiatric evaluation with Dr. Solomon Mishkin ("Dr. Mishkin"). (Ex. 11F at 1.) While Dr. Mishkin observed "some mild irritability, dysphoria and dejection," he noted that Plaintiff drove to the interview, denied having


suicidal thoughts, had clear speech, and "good" response time and comprehension. (Id. at 1, 2.) Dr. Mishkin diagnosed Declercq with major depressive disorder that is moderate to chronic in severity, without psychotic features. (Id. at 3.) Dr. Mishkin concluded that Declercq has "a fair ability to understand, carry out and remember instructions, and a limited ability to respond appropriately to supervision, coworkers and mild work pressures in a work setting. Adaptability and stress tolerance are limited." (Id.)

On October 30, 2007, Dr. Rakeesh Bansil ("Dr. Bansil") determined that Plaintiff suffered from an adjustment disorder with depressed mood. (Ex. 13F at 1, 4.) Nevertheless, he concluded that Declerq's impairment was not severe. (Id. at 1.) Additionally, Dr. Bansil found that Plaintiff's limitations were mild in the following areas: restriction of activities of daily living, difficulties in maintaining social functioning, difficulties in maintaining concentration, persistence or pace. (Id. at 11.) Declercq maintains that his psychological symptoms affect his sleep cycle, "memory, concentration, ability to follow instructions," and ability to socialize. (Tr. 9-10, 13.) Although he takes medications for his sleep and anxiety, he alleges that they do not control his symptoms. (ALJ Decision at 4; Tr. 14-15.)

## STANDARD OF REVIEW

In social security appeals, this Court has plenary review of the legal issues decided by the Commissioner. Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir. 2000). Yet, this Court's review of the ALJ's factual findings is limited to determining whether there is substantial evidence to support those conclusions. Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988) (internal quotation marks omitted). Substantial evidence is "less than a

preponderance of the evidence, but 'more than a mere scintilla'; it is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Bailey v. Comm'r of Soc. Sec., 354 Fed. Appx. 613, 616 (3d Cir. 2009) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). More importantly, "[t]his standard is not met if the Commissioner 'ignores, or fails to resolve a conflict created by countervailing evidence.'" Bailey, 354 Fed. Appx. at 616 (quoting Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983)). If the factual record is adequately developed, substantial evidence "may be 'something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" Daniels v. Astrue, 2009 U.S. Dist. LEXIS 32110, at *7 (M.D. Pa. Apr. 15, 2009) (quoting Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966)). "The ALJ's decision may not be set aside merely because we would have reached a different decision." Cruz v. Comm'r of Soc. Sec., 244 Fed. Appx. 475, 479 (3d Cir. 2007) (citing Hartranft, 181 F.3d at 360). The court is required to give substantial weight and deference to the ALJ's findings. Scott v. Astrue, 297 Fed. Appx. 126, 128 (3d Cir. 2008). However, "where there is conflicting evidence, the ALJ must explain which evidence he accepts and which he rejects, and the reasons for that determination." Cruz, 244 Fed. Appx. at 479 (citing Hargenrader v. Califano, 575 F.2d 434, 437 (3d Cir. 1978)).

## DISCUSSION

An individual will be considered disabled under the Act if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" lasting continuously for at least twelve months. 42 U.S.C. § 423(d)(1)(A). The physical or mental impairment must be severe enough to render the individual "not only unable to do his previous work but [unable] considering his age, education, and work experience, [to]

8

engage in any other kind of substantial gainful work which exists in the national economy." § 423(d)(2)(A) (internal quotation marks omitted). Subjective complaints of pain alone, cannot establish disability. § 423(d)(5)(A). Instead, a claimant must show that the "medical signs and findings" related to her ailment have been "established by medically accepted clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged." Id. The Social Security Administration (the "SSA") utilizes a five-step sequential analysis to determine disability. Cruz, 244 Fed. Appx. at 480 (citing 20 C.F.R. § 404.1520 (a)(4)(i)-(v) (2011)). "A negative conclusion at steps one, two, four or five precludes a finding of disability." Cruz, 244 Fed. Appx. at 480. However, "[a]n affirmative answer at steps one, two or four leads to the next step. An affirmative answer at steps three or five results in a finding of disability." Id. (quoting § 404.1520 (a)(4)(i)-(v)) (internal quotation marks omitted). The United States Supreme Court describes the evaluation process as follows:

> The first two steps involve threshold determinations that the claimant is not presently working and has an impairment which is of the required duration and which significantly limits his ability to work. In the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work. If the claimant's impairment matches or is "equal" to one of the listed impairments, he qualifies for benefits without further inquiry. If the claimant cannot qualify under the listings, the analysis proceeds to the fourth and fifth steps. At these steps, the inquiry is whether the claimant can do his own past work or any other work that exists in the national economy, in view of his age, education, and work experience. If the claimant cannot do his past work or other work, he qualifies for benefits.

Sullivan v. Zebley, 493 U.S. 521, 525-26 (1990); see also 20 C.F.R. § 404.1520(a)(4)(i)-(v). The burden of persuasion lies with the claimant in the first four steps. Malloy v. Comm'r of Soc.

9

Sec., 306 Fed. Appx. 761, 763 (3d Cir. 2009). Once the claimant is able to show that the impairment prevents him from performing his past work the burden shifts to the Commissioner to demonstrate "that the claimant still retains a residual functional capacity to perform some alternative, substantial, gainful activity present in the national economy." Id. (citing Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987)).

In the instant matter, the ALJ found that Plaintiff met the first step of the five-step evaluation process since Plaintiff has not engaged in substantial gainful activity since May 25, 2005. (ALJ Decision at 5.) However, in step two, the ALJ concluded that Plaintiff "does not have an impairment or combination of impairments that has significantly limited (or is expected to significantly limit) [] [his] ability to perform basic work-related activities." (Id.); see also 20 C.F.R. 404.1520(c). Plaintiff claims that the ALJ erred by: (1) failing to find that his impairments are severe, either singly or in combination; and (2) failing to make a proper credibility finding regarding his testimony. (Pl.'s Br. 4, 16.)

1. **ALJ's Step Two Analysis**

"At step two of the analysis, [the] [p]laintiff bears the burden of introducing sufficient evidence to establish a severe impairment or combination of impairments." Witkowski v. Astrue, 2010 U.S. Dist. LEXIS 54570, at *20 (D.N.J. June 3, 2010) (citing Bowen v. Yuckert, 482 U.S. 137, 146-47 (1987)). This step is "'a de minimis screening device to dispose of groundless claims.'" Herrera v. Comm'r of Soc. Sec., 2010 U.S. Dist. LEXIS 82056, at *10 (D.N.J. August 12, 2010) (quoting Beasich v. Comm'r of Soc. Sec., 66 Fed. Appx. 419, 428 (3d Cir. 2003)). At step two, a plaintiff must establish: "(1) the existence of a medically determinable physical or mental impairment, and (2) that such impairment is 'severe' within the meaning of the Regulations." Cruz, 2009 U.S. Dist. LEXIS 69461, at *16 (citing 20 C.F.R. §§

416.920a, 416.924, 416.929(b); 42 U.S.C. § 423(d)(5)). For an impairment or combination of impairments to be found "not severe," the evidence must establish that "a slight abnormality or combination of slight abnormalities [] have no more than a minimal effect on an individual's ability to work." Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 546 (3d Cir. 2003) (citation omitted) (internal quotation marks omitted). "Basic work activities are 'abilities and aptitudes necessary to do most jobs, including . . . walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling.'" Id. (quoting 20 C.F.R. §§ 404.1520(c), 404.1521(a)).

Here, the ALJ properly articulated the relevant regulation criteria and provided a sufficient basis to support his conclusions that Declercq's impairments, either singly or in combination, are not severe. As described previously, the step-two analysis includes two sub-steps. In the first sub-step, the ALJ determined that Declercq suffered from cervical and lumbar disorder and depression. (ALJ Decision at 5.) However, in the second sub-step, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that significantly limits his ability to perform basic work activities." (Id. at 6.)

The ALJ's determination at the second sub-step regarding Plaintiff's cervical and lumbar disorder is supported by substantial evidence. Declercq's alleged cervical and lumbar disorder is related to a July 3, 2003 motor vehicle accident. (Id. at 4.) The ALJ indicated that subsequent MRI evidence following the accident did not "show significant findings, such as disc herniations and nerve root compromise." (Id.) Dr. Schmaus reviewed Plaintiff's MRI and "found no significant stenosis or herniations," (id. at 7), and an EMG study conducted on September 23, 2003, was negative. (Id.; Ex. 19F at 2.) On April 15, 2004, Dr. Martinez articulated that Plaintiff was "capable of working in a less strenuous type of activity." (Ex. 22F at 3.) Dr. Martinez rendered a similar conclusion approximately one year later, stating that there was no

11

"objective evidence of radiculopathy" and that Plaintiff was physically capable of working. (Id. at 5.) On July 26, 2005, Dr. Birnbaum advised that Declercq had a lumbar disc displacement, but that his condition was non-surgical and with "[n]o red flags." (Ex. 4F at 6.) The ALJ also examined the physical therapy reports between April 13, 2005 and September 12, 2005, which revealed that Plaintiff was active and lifting heavy objects during this period. (ALJ Decision at 7.) Furthermore, according to the RFC report, Plaintiff can perform "[w]ork done primarily seated with only occasional standing or walking required, lifting a maximum of 10 pounds, and lifting such articles as dockets, ledgers, and small tools." (Ex. 8F at 4.)

Moreover, the ALJ cited to Dr. Friedman's conclusions based on a physical examination conducted on August 31, 2007. Dr. Friedman concluded that the "[p]hysical exam reveal[ed] a gentleman in no acute distress," and although Plaintiff had some facet anthropathy, there was "no evidence of an active radiculopathy." (ALJ Decision at 7; Ex. 12 F at 2.) The ALJ described Dr. Friedman's findings as consistent with reports taken between May 8, 2007 and July 10, 2007, at St. Joseph's Regional Medical Center, which indicated that Plaintiff had "full or nearly full strength in the upper and lower extremities, with intact sensation, except for the bilateral ulnar nerve distribution." (ALJ Decision at 7.)

Additionally, the ALJ considered and addressed conflicting probative evidence in the record. For example, on March 1, 2006, Dr. Tiger opined that Plaintiff had the "residuals of a chronic cervical strain syndrome with chronic myofascitis and a 4-5 bulging disc for which [he] would estimate a disability of 30% of partial total" and the "residuals of a chronic lumboscaral strain syndrome with chronic myofascitis, a protruding 4-5 disc with a left-sided L5 radiculopathy for which [he] would estimate a disability of 35% of partial total." (Ex. 24F at 2.) However, the ALJ determined that Dr. Tiger's findings were at odds with reports from Dr.

Friedman and from St. Joseph's Regional Medical Center. (ALJ Decision at 8.) Hence, the ALJ concluded that Dr. Tiger's opinion deserves lesser weight. Id.; see Cotter, 642 F.2d at 705 ("We are also cognizant that when the medical testimony or conclusions are conflicting, the ALJ is not only entitled but required to choose between them."). Similarly, the ALJ assessed the RFC report, which indicated that Declercq had chronic cervical and lumbar radiculopathy with myofascitis and can "be expected to tolerate" walking, standing, or sitting for only "less than one hour" in an eight-hour day, and that he could "occasionally" lift a five to ten pound weight. (ALJ Decision at 8; Ex. 8F at 1.) The ALJ concluded that this portion of the RFC report conflicted with Dr. Friedman and Dr. Bender's reports and with MRI evidence that showed no severe orthopedic problems "such as disc herniation, stenosis, and nerve root compromise." (ALJ Decision at 8.)

The ALJ also determined that Plaintiff did not meet the C.F.R. severity threshold at step two for his mental impairment. (Id. at 9.) Under 20 C.F.R. § 404.1520a(b), the ALJ must first assess a plaintiff's "'pertinent symptoms, signs, and laboratory findings' to determine whether a mental impairment exists." Rodriguez, 2010 U.S. Dist. LEXIS 71196, at *10 (quoting 20 C.F.R. § 404.1520a(b)(1)). If a medically determinable impairment exists, the ALJ must assess "the severity of [the] [c]laimant's impairments as to four broad functional areas including 1) daily living, 2) social functioning, 3) concentration, persistence or pace, and 4) deterioration in work-like settings." Rodriguez, 2010 U.S. Dist. LEXIS 71196, at *10-11 (citing 20 C.F.R. § 404.1520a(b)(3)).

In the present case, the ALJ concluded that Declercq's determinable mental impairment is non-severe since it "causes no more than mild limitation in any of the first three functional areas and no episodes of decompensation which have been of extended duration in the fourth

area." (ALJ Decision at 9) (citations omitted) (internal quotation marks omitted). Declercq was diagnosed with dysthymic disorder and received a Global Assessment of Functioning ("GAF") score of 54 on November 11, 2004. (Ex. 29F at 6.) On October 24, 2006, Dr. Wang diagnosed Declercq with major depressive disorder with a GAF score of 35-45 at his initial psychiatric evaluation. (Ex. 9F at 39.)

Plaintiff contends, in part, that the ALJ erred in finding his mental impairment to be non-severe despite his GAF ratings. (Pl.'s Br. 7-8.) However, the ALJ need not accord controlling evidentiary weight to Plaintiff's GAF ratings when there is substantial evidence in the record supporting the non-severity of Plaintiff's mental health, nor do GAF ratings necessarily resolve whether Plaintiff should be considered disabled. See Russo v. Astrue, 2011 U.S. App. LEXIS 7098, at *17-18 (3d Cir. Apr. 6, 2011) (explaining that other evidence in the record can undermine the weight of a claimant's GAF score); see also Gilroy v. Astrue, 351 Fed. Appx. 714, 715 (3d Cir. 2009) ("A GAF score does not have a direct correlation to the severity requirements of the Social Security mental disorder listings . . . ."); Chanbunmy v. Astrue, 560 F. Supp. 2d 371, 383 (E.D. Pa. 2008) ("[N]either Social Security regulations nor case law require an ALJ to determine the extent of an individual's mental impairment based solely on a GAF score.").

Further, "[a]n ALJ may reject a treating physician's opinion . . . [or] may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided." Plummer, 186 F.3d at 429. Here, the ALJ cited to Dr. Wang's mental status notes, which indicated that Plaintiff's level of impairment steadily improved from the period of November 16, 2006 to July 24, 2007. (Ex. 9F at 4-35.) For instance, on July 24, 2007, Dr. Wang's report noted that Declercq had slight depression or anxiety. (Id. at 2.) And

although Dr. Mishkin diagnosed Declercq with major depressive disorder that is moderate to chronic in severity, he concluded that Declercq has "a fair ability to understand, carry out and remember instructions, and a limited ability to respond appropriately to supervision, coworkers and mild work pressures in a work setting." (Ex. 11F at 3.) Moreover, the ALJ concurred with Dr. Bansil's finding that Plaintiff's limitations were mild in the following areas: restriction of activities of daily living, difficulties in maintaining social functioning, difficulties in maintaining concentration, persistence or pace. (ALJ Decision at 9; Ex. 13F at 11.) The ALJ also determined that Plaintiff had no episodes of decompensation. (ALJ Decision at 9.) Hence, the ALJ properly considered all four categories of functioning in determining that Plaintiff had no severe mental impairment. As such, this Court concludes there was substantial and sufficient evidence to justify the ALJ's decision that Plaintiff's physical and mental impairments were not severe within the statutory meaning of 20 C.F.R. § 404.1520(a)(4)(ii).

## 2. ALJ's Credibility Findings on Plaintiff's Subjective Complaints

Plaintiff contends that the ALJ erred in concluding that his subjective complaints were not credible. Specifically, Declercq posits that the ALJ did not provide sufficiently specific reasons for discounting Plaintiff's credibility, but "merely offered his summary of the medical records." (Pl.'s Br. at 18.)

The ALJ must "consider . . . all symptoms, including pain, and the extent to which [] [such] symptoms can reasonably be accepted as consistent with objective medical evidence." 20 C.F.R. § 404.1529(a). "While a claimant's subjective complaints must be given serious consideration, they must also be supported by medical evidence." Johnson v. Comm'r of Soc. Sec., 398 Fed. Appx. 727, 735 (3d. Cir. 2010) (citing Smith v. Califano, 637 F.2d 968, 972 (3d. Cir. 1981); Williams v. Sullivan, 970 F.2d 1178, 1186 (3d Cir. 1992)). The ALJ may not

discredit a claimant's subjective complaints based on his/her "own medical judgment; it must be discredited by contradictory medical evidence." Cruz, 244 Fed. Appx. at 481 (quoting Kent, 710 F.2d at 115). "[T]he ALJ must also consider and weigh all of the [medical and] non-medical evidence before him." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 122 (3d Cir. 2000). If there are inconsistencies in the evidence, the ALJ must mention and analyze the contradictory evidence that tends to discredit the claimant. Id. The ALJ must not only express which evidence he relies on to support his decision, he "must [also] give some indication of the evidence which he rejects and his reason(s) for discounting such evidence." Id. at 121 (citing Plummer, 186 F.3d at 429). Furthermore, Social Security Ruling ("SSR") 96-7p provides:

> The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. *It is not sufficient to make a conclusory statement that "the individual's allegations have been considered," or that "the allegations are not credible."* It is also not enough for the adjudicator to simply recite the factors that are described in the regulations for the evaluation of symptoms.

(emphasis added).

However, "[t]he ALJ's assessment of credibility is an essential function of the Judge," and "[t]he ALJ's conclusions on a [p]laintiff's lack of credibility are within the ALJ's unique province." Sullivan v. Astrue, 2010 U.S. Dist. LEXIS 71211, at *20 (D.N.J. July 15, 2010); see also Gainey v. Astrue, 2011 U.S. Dist. LEXIS 44369, at *39-40 (D.N.J. Apr. 25, 2011) ("The ALJ has the authority to make credibility determinations of a plaintiff's testimony, [e]specifically with regard to pain and other subjective complaints.") (citing Malloy, 306 Fed. Appx. at 765).

In the instant matter, the ALJ determined that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they

16

are inconsistent with the finding that the [Plaintiff] has no severe impairment or combination of impairments." (ALJ Decision at 6.) Contrary to Plaintiff's assertion, the ALJ does provide sufficiently specific reasons for his credibility finding. With respect to Plaintiff's cervical and lumbar disorder, the ALJ noted that Plaintiff was active during his treatment. (Id. at 7.)

To be sure, the ALJ also discredited Plaintiff's complaints by raising contradictory medical evidence. The ALJ cited to multiple findings in the record that suggest that Plaintiff's physical injury is non-severe. For instance, the ALJ referred to Dr. Friedman and Dr. Bender's reports, which indicated that Plaintiff had a normal gait and no active radiculopathy, and to Dr. Schachtel's finding that Plaintiff's orthopedic impairments were non-severe following a review of Dr. Friedman's report. (Id.) Furthermore, the ALJ provided sufficient reasons explaining why the severity of Declercq's orthopedic impairments cited in his RFC report and Dr. Tiger's examination should be discounted. The ALJ indicated that Plaintiff's RFC report was "inconsistent with the MRI evidence, which [did] not document significant orthopedic problems" and that Dr. Tiger's opinion deserved lesser weight in light of Dr. Friedman's report and records from St. Joseph's Regional Medical Center. (Id. at 8.)

Likewise, the ALJ's credibility finding regarding Declercq's mental impairment was conducted in conformity to the Act and was supported by relevant evidence in the record. The ALJ explained that while Plaintiff had a medically determinable mental impairment, it caused "no more than 'mild' limitation in any of the first three functional areas and 'no' episodes of decompensation which have been of extended duration in the fourth area." (Id. at 9) (citing 20 C.F.R. § 404.1520a(d)(1). Plaintiff also testified at his hearing that he had "depressive symptoms, such as low energy," and that he was receiving psychiatric treatment at St. Joseph's.

(ALJ Decision at 9.) Although the ALJ left the record open for Plaintiff to submit additional evidence relating to his psychiatric treatment at the time, none was received. (Id.)

The ALJ offers a sufficiently thorough analysis of Plaintiff's depression in reaching his conclusion. In particular, the ALJ noted Plaintiff's GAF scores and medical evidence demonstrating that Plaintiff has chronic to moderate major depressive disorder. (Id. at 8-9.) Nevertheless, the ALJ also raised other evidence revealing that Plaintiff had "mostly slight or no symptoms" with no "sustained psychological problem" and that Plaintiff's limitations were mild in the following areas: restriction of activities of daily living, difficulties in maintaining social functioning, difficulties in maintaining concentration, persistence or pace. (Id. at 9.) Accordingly, the ALJ made a valid credibility determination based on substantial evidence as to the degree of Plaintiff's subjective complaints.

## CONCLUSION

For the foregoing reasons, the ALJ's decision is **AFFIRMED**.

**SO ORDERED.**

s/ Susan D. Wigenton
**Susan D. Wigenton, U.S.D.J.**

CC: Madeline Cox Arleo, U.S.M.J.